UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

**DECISION AND ORDER**
v.                                                     17-CR-119

ROMAN DUNNIGAN,

Defendant.

---

## INTRODUCTION

Defendant Roman Dunnigan (hereinafter "Defendant") is charged by way of a one-count Indictment for conspiracy to possess with intent to distribute, and to distribute, 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).[1] (Dkt. No. 1). This case was referred to Magistrate Judge Jeremiah J. McCarthy for supervision of all pretrial proceedings. On August 14, 2017, Defendant filed a motion seeking suppression of all evidence obtained by and statements made to law enforcement after a traffic stop. (Dkt. No. 10). After an evidentiary hearing on December 5, 2017, briefing, and oral argument on the motion, Magistrate Judge McCarthy issued a Report and Recommendation on April 9, 2018, recommending, *inter alia*, that Defendants' motion to suppress be denied.[2] (Dkt. No. 43).

On May 14, 2018, Defendant filed objections to the Magistrate Judge's Report and Recommendation. (Dkt. No. 48). The United States filed a response on May 29, 2018.

---

[1] Defendant is jointly charged with co-defendant Henry Lloyd, but Lloyd is not a party to the motion at bar. *See* (Dkt. No. 1).

[2] The Report and Recommendation also addressed other motions not at issue here. *See* (Dkt. No. 43).

(Dkt. No. 50). On June 29, 2018, this Court adopted the Magistrate Judge's Report and Recommendation in its entirety. (Dkt. No. 53).

However, Defendant filed a supplemental motion to suppress all evidence and "derivative evidence" (Dkt. No. 103 at 2) before this Court on September 9, 2018, asking the Court to reopen the matter—arguing that circumstances existed that warranted a reopening of the suppression issue. (Dkt. No. 60). Specifically, Defendant moved to reopen the suppression matter so that newly retained counsel could challenge the K-9 assisted search of Defendant's vehicle, which had not been previously argued by his former attorney. *Id.* The United States filed a response in opposition to the supplemental motion. (Dkt. No. 72). Due to the new issues raised by Defendant concerning how the K-9 sniff was conducted, this Court granted a reopening on January 28, 2019. *See* (CM/ECF Minute Entry for Jan. 28, 2018). On August 14, 2019, this Court held an evidentiary hearing and the Court instructed that it would take the matter under advisement after it received post-argument briefing. *See* (CM/ECF Minute Entry for Aug. 14, 2019). Defendant filed his post-argument brief on September 6, 2019 (Dkt. No. 103), and the Government filed its brief on September 13, 2019. (Dkt. No. 105). For the reasons below, the Court denies Defendant's supplemental motion to suppress.

## BACKGROUND

As previously stated, the Court adopted the Report and Recommendation of Magistrate Judge McCarthy and has accordingly adopted the statement of facts contained therein. The Court will also make further findings as set forth in this Decision and Order. The facts are also summarized below for the sake of clarity.

I.    Events in Buffalo, New York

On May 8, 2017, law enforcement learned that Defendant purchased four plane tickets from Buffalo, New York to Houston, Texas, and had attempted to purchase the tickets in cash.[3] Special Agent Mark Gentile testified at the December 5, 2017 evidentiary hearing that persons purchasing plane tickets last minute in cash may indicate criminal activity. SA Gentile also testified that Houston is a source city for drug transportation to Buffalo. Co-defendant Lloyd and two female individuals who Lloyd was associated with were seen at the airport on the same day as Defendant. Officers at the airport found Lloyd and the two female associates to be collectively carrying $64,000 in cash. This cash was seized following the airport security screening. A narcotics-trained K-9 alerted to the presence of narcotics on the seized currency.

Lloyd and his female associates were subsequently interviewed by law enforcement. Defendant ultimately did not board his flight that day. During the interview of co-defendant Lloyd and his two associates at the airport, law enforcement learned that one of the female individuals was arranged to travel with someone named "Roman". This individual also told law enforcement that she was flying to Houston for a "celebration" and was personally carrying $25,000 in cash. The other female individual declined to answer any questions regarding the large sum of cash she was carrying. At some point during his interview, co-defendant Lloyd revealed discretely to law enforcement that he wanted to tell them why they were really going to Texas—implying that what they originally told law enforcement at the airport was untruthful.

---

[3] The Court is summarizing from Magistrate Judge McCarthy's Report and Recommendation and the parties' various briefings on the matter. Pertinent factual disputes are noted.

That same day, after all four individuals either missed or cancelled their flights to Houston, they purchased tickets to fly to Houston out of Rochester, New York. According to law enforcement, given co-defendant Lloyd's criminal history and the amount of cash that was divided up among Defendant, Lloyd, and the two female individuals, law enforcement believed they all were traveling to Houston to purchase drugs.

II.     Events in Houston, Texas

Law enforcement in Buffalo contacted the DEA Task Force in Galveston, Texas, to relay what they had learned in Buffalo about Defendant, co-defendant Lloyd, and the two female individuals. A follow-up investigation commenced in Houston. Specifically, agents began surveillance of the four individuals upon their arrival to Houston and continued surveillance for the duration of their stay. Soon after arriving in Houston, Defendant and co-defendant Lloyd purchased an inflatable chair at a Walmart and brought it back to their hotel.

After returning to the hotel, a rental vehicle with paper license plates and dark tinted windows pulled up to the hotel and picked up Defendant. This rental vehicle initially was driven very slowly, which according to law enforcement, is a method used to detect law enforcement surveillance, before it sped up and successfully evaded the surveillance vehicles. Later that day co-defendant Lloyd was seen exiting a vehicle at the hotel holding a small blue bag, consistent with the types of bags used for drugs. According to testimony from the April 5, 2017 evidentiary hearing, the surveillance officers at this time believed Defendant was involved in purchasing drugs. Officers called a K-9 unit to be on standby the following morning due to the possible drugs seen carried into the hotel.

The next morning, May 11, 2017, Defendant and co-defendant Lloyd were observed by law enforcement leaving the hotel with the inflatable chair box and placing it in the cargo area of the rental vehicle and then drove away with Lloyd.

III.     The Traffic Stop

Officer Francisco Gomez, one of two police officers who would initiate the traffic stop, was informed on May 11, 2017 to "look for a narcotics vehicle"—but was not told anything additional about the vehicle or its occupants. Officer Gomez observed Defendant's vehicle fail to stay in its lane and failed to signal when making a lane change. Officer Gomez pulled the vehicle over and asked for Defendant, who was driving, to get out of the vehicle and stand on the sidewalk away from the street. Law enforcement separately questioned Defendant and co-defendant Lloyd. Both Defendant and Lloyd provided conflicting answers to questions regarding whether they were staying with anyone else in Houston and why they had an inflatable chair box in the back of the vehicle. Additionally, Defendant stated that he was from Georgia and was in Houston to buy property—information law enforcement knew to be false.

During the stop, Defendant was asked whether there were illicit drugs or other contraband in the vehicle and for permission to search the vehicle. Defendant refused a search of the vehicle. It was at this time that the officers requested assistance from the K-9 unit nearby.

IV.     Lola's First Pass Around the Vehicle

Officer Steven Fisher and his K-9 partner Lola were called to the scene of the traffic stop. Upon arrival, Officer Fisher exited his police vehicle with Lola and approached

Defendant's rental car. Once near the vehicle, Officer Fisher gave Lola her search command "sooke"—the verbal cue that prompts Lola to begin sniffing the area in search of the narcotics she is trained and certified in to detect. The K-9 team began the search[4] at the front passenger headlight and moved their way around the vehicle. When Lola reached the rear tailgate area, she changed her behavior by standing up on her hind legs and reaching her nose into the air. When Lola reached the driver's side door, she again changed her behavior by sniffing the door handle and she touched the door handle.

Lola then headed towards a nearby tree. Because the tree was not the target of the search, Officer Fisher gave Lola the command "sooke" again.[5] Lola, at the end of her taut leash, turned back around toward the vehicle, passing Officer Fisher on the way, and continued sniffing around the vehicle.

V.     Lola's Second Pass Around the Vehicle

Officer Fisher and Lola again went to the front of the vehicle.  Lola passed the passenger side door, which was open,[6]and she jumped into the vehicle and gave a final alert on the center console. After Lola alerted on the center console, she attempted to get under the driver's seat. Houston police officers then searched the vehicle and found one kilogram of cocaine in the inflatable chair box in the back of the vehicle. During the August 14, 2019 testimony, Officer Fisher explained that because Lola is trained to locate and alert at the source of an odor, and because Lola attempted to get under the seat, he

---

[4] The Court colloquially refers to Lola's sniffing for drugs as a search, but this is not to be confused with a search under the Fourth Amendment.

[5] This fact is disputed by the parties and discussed below.

[6] This fact is also in dispute. Defendant seems to imply that one of the officers may have opened the door; however, Officer Fisher testified that the door was open by the time he began moving with Lola around the vehicle. *See* (Tr. II at 38).

believed the narcotics were first underneath the seat before they were in the inflatable chair box located in the rear cargo area.

## DISCUSSION

Defendant, for a second time, moves to suppress all evidence obtained as a result of the May 11, 2017 search of his rental vehicle.[7] Defendant argues that all evidence and derivative evidence obtained from the vehicle were the fruit of an illegal search when Officer Fisher unlawfully commanded Lola "back" to the vehicle after she had "finished" her search and then unlawfully commanded Lola to enter the vehicle. Defendant also argues that there was no probable cause to search the interior of the vehicle because Lola never alerted to the presence of narcotics during her initial sniff of the exterior of the vehicle—she only gave "indications"—which, according to Defendant, do not amount to alerts.

The Government argues that Lola was never commanded to enter the vehicle— she entered the vehicle on her own. The Government also argues that even if Lola had not alerted to the odor of narcotics, probable cause existed prior to the traffic stop due to the information gathered during the airport security check in Buffalo, New York, Defendant's surveillance in Houston, and conflicting information Defendant and co-defendant Lloyd gave officers after being pulled over.

The Court has carefully considered the August 14, 2019 testimony of Officer Fisher and the video of the Houston Police Department's traffic stop.[8] The Court also reviewed

---

[7] Defendant does not contest the lawfulness of the traffic stop at this juncture.
[8] Due to a malfunction of the body camera, it only recorded Lola's first pass around the vehicle. *See* (Exh. 8); *see also* (Tr. II at 50-52).

all submissions by the parties. The Court finds that probable cause existed to conduct a search after Lola's final alert. The Court further finds that probable cause also existed prior to the K-9 assist.

I.     Legal Standard

On a motion to suppress evidence, a defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. *See United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996). If the defendant meets that initial burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence that the search or seizure did not contravene the Fourth Amendment. *Bayless*, 921 F. Supp. at 213 (citing *United States v. Arboleda*, 633 F.2d at 989). "Thus, '[w]hen [the government] has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted.'" *Id.* (quoting *United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir.1987)).

During a traffic stop, the police may ordinarily use "a well-trained narcotics-detection dog"[9] outside a lawfully stopped car without implicating "legitimate privacy interests." *Illinois v. Caballes,* 543 U.S. 405, 409 (2005). Put another way, a K-9 sniff around the outside of a vehicle is not a search and the police need not first obtain consent or establish probable cause. *See United States v. Trapp*, No. 13-CR-62, 2014 WL 1117012 (D. Vt. Mar. 20, 2014).

---

[9] Defendant does not contest the reliability of Lola's training and certification.

The test for determining whether the assistance of a narcotics-trained K-9 provided probable cause to search the interior of the vehicle is if all the facts surrounding a reliable K-9's alert, when "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013) (". . . a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

The Court also considers the totality of the circumstances and evaluates those circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *See Bayless*, 921 F. Supp. at 133 (citing *United States v. Oates*, 560 F.2d 45, 61 (2d Cir.1977)).

II.     The Exterior Sniff and Search

Defendant argues that law enforcement did not have probable cause to search the vehicle because Lola did not alert to the odor of narcotics during her "first" search. (Dkt. No. 103 at 6-8). Instead, Defendant argues that Lola had finished the search on her own, and then Officer Fisher unlawfully brought Lola back to the vehicle to initiate a "second" search. Defendant further argues that during this "second" search, Officer Fisher unlawfully encouraged Lola to jump into the vehicle before she ultimately alerted to a narcotics odor around the center console of the vehicle (the "final alert"). Consequently, Defendant argues that all evidence obtained from the search must necessarily be suppressed because no action by Lola could legally establish probable cause.

Aside from failing to establish probable cause, Defendant also contends that the Government cannot ultimately meet their burden because Officer Fisher's testimony at the evidentiary hearing on August 14, 2019 was inconsistent with his initial testimony from

April 5, 2017, and therefore unreliable. (Dkt. No. 103 at 8-15). The Court will address

Officer Fisher's credibility first.

    *a.  Officer Fisher's credibility*

The Court notes some discrepancies in Officer Fisher's testimony on August 14,

2019, due primarily to the fact that Officer Fisher interchanged the terms "alert" and

"indication" when referring to Lola's changes of behavior during her sniff of the exterior of

the vehicle. However, the Court also notes that the attorneys in questioning Officer Fisher

also frequently interchanged the terms "alert" and "indication"—which made the testimony

that much more confusing.

For example, Officer Fisher seemed to initially testify on direct examination that

Lola's two changes of behavior around the exterior of the vehicle were akin to an alert,

because the *question* posed to Officer Fisher used the word "alert". *See* (Tr. II at 39)[10]

("Q: So, those were two *alerts* that she gave you that there might be something present

in the vehicle? A: Yes."). Officer Fisher later corrected himself by clarifying that Lola does

*not* give alerts, she gives "finals" when she finds the source of an odor, and what Lola

was displaying around the vehicle's exterior would be better described as "*indications.*"

Upon close review of the record, it appears to the Court that Officer Fisher was simply

attempting to mirror the terminology (albeit incorrect terminology) in the questions posed

by both attorneys when answering their questions. The Court notes that this was

nonetheless confusing.

Generally speaking, "[t]he Second Circuit has instructed that where a Magistrate

Judge conducts an evidentiary hearing and makes credibility findings on disputed issues

---

[10] In keeping with the citations both parties adhered to, the Court will also refer to the April 5, 2017 evidentiary hearing transcript as "Tr. I" and the August 14, 2019 evidentiary hearing transcript as "Tr. II".

of fact, the district court will ordinarily accept those credibility findings." *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013) (citing *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008)). However, the Court recognizes that Officer Fisher testified again before *this* Court on the reopened motion to suppress, and the Court will make its own independent credibility determination.

Despite the confusing terminology, the Court finds Officer Fisher to be credible. The Court bases a favorable credibility finding on a number of factors. First, Magistrate Judge McCarthy found Officer Fisher to be credible during the first evidentiary hearing. *See Lawson*, 961 F. Supp. 2d at 499 (the district court will give deference to a magistrate judge's credibility finding). Second, this Court had the opportunity to observe the demeanor of the witness over the course of the August 14, 2019 evidentiary hearing. Third, to the extent that the body camera recording was operable, Officer Fisher's testimony corroborated that recording. Fourth, Officer Fisher was able to present a strong foundation of his expertise and experience as a K-9 handler, namely, that he has been a senior police officer with the Houston Police Department for over 24 years and a K-9 handler for about ten years (Tr. II at 16-18) and testified that he personally trained with Lola for approximately 140 to 160 hours. *See id.* at 19-26. Last, Officer Fisher did attempt to clarify his testimony at the August 14, 2019 hearing and admitted during cross-examination that he "could have spoken better" during his initial testimony on April 5, 2017. (Tr. II at 62). This demonstrates to the Court the witness's candor in his attempt to explain himself.

*b. Lola's first pass around the vehicle*

The parties do not dispute that the exterior sniff was not a search and therefore no Fourth Amendment implications attach. Accordingly, since Lola was sniffing around the exterior of the vehicle during her first pass around the vehicle, the Court finds that no search occurred at this juncture.

However, in describing Lola's behaviors during her exterior sniff, Defendant makes a legal distinction between an "indication" and an "alert." Specifically, Defendant argues that Lola standing on her hind legs and pointing her nose into the air by the cargo area and subsequently touching a door handle during the first pass around the vehicle were simply "indications" and not "alerts", and that those "indications" are not legally sufficient to establish probable cause. *See* (Dkt. No. 103 at 9).

Office Fisher testified that Lola's indications around the exterior of the vehicle are not considered her final alert. *See, e.g.*, (Tr. II at 49). Therefore, upon consideration of this testimony, and because law enforcement did not actually search the vehicle until Lola later displayed a final alert and that final alert is not in dispute, the Court declines to make a finding on whether Lola's changes of behavior or indications during her exterior sniff provided probable cause to search the interior of the vehicle.

Nevertheless, Lola's indications around the exterior of the vehicle are still significant. Officer Fisher testified why this is the case:

> Q: Now, before you continue, what sort of behavioral cues do you look for in Lola to tell you that she has alerted to narcotics?
>
> A: The changes in her breathing, the changes in her speed of searching, excitement that she shows. Her hair will stick up, her tail will wag faster. Those are the biggest ones.

12

Q:     Now, if a dog gets on her hind legs and just kind of stands up, is that a cue for you as well?

A:     Yes. It shows that she's got something that she's trying to get to. Dogs don't normally stand on their own hind legs by themselves. So, that's a cue that something is not right and that she is in an odor.

…

Q:     But for you, it was a cue that she has alerted to something?

A:     That she has an indication there's an odor there that she's trying to find.

(Tr. II at 36-37). Officer Fisher testified that Lola's behaviors exhibited around the exterior of the vehicle demonstrate that she "is in odor"—meaning that she *has detected* at least one of the illicit substances she is trained to seek out[11]—and that she was working to pinpoint the source of that odor. In other words, Officer Fisher had reason to believe, "guided by his experience and training," that Lola might not have completed her search during the first pass, because she indicated she detected narcotics, but had not yet located the source of the odor. *See Bayless*, 921 F. Supp. at 133.

   *c.  Lola displays "bracketing" behavior*

   After Lola completed a first pass around the vehicle, Officer Fisher testified that Lola displayed "bracketing" behavior by following a trail of odor to a nearby tree. (Tr. II at 39-41).  It is disputed whether Officer Fisher gave Lola her search command again in order to refocus her search back to the vehicle. *Id.* at 43, 52. But in any event, Lola made her way back to the vehicle to conduct a second pass around the vehicle. *Id.* at 51-52.

---

[11] Lola is trained to only detect marijuana, cocaine, heroin, methamphetamine, and MDMA. *See* (Tr. II at 20, 23-24).

Defendant makes another distinction here regarding the "first" and "second" pass around the vehicle. Defendant's questioning on cross-examination seemed to imply that Lola had the ability to terminate the search on her own and that she decided she was "done" searching when she headed away from the vehicle. Accordingly, Defendant argues Officer Fisher unlawfully initiated a "second" search—implying that Officer Fisher was not legally permitted to begin "another" search because Lola's negative findings during the first pass foreclosed that option. (Tr. II at 61-62) ("Q: It's fair to say that [Lola] considered her search of the vehicle complete, correct? She did not alert and she walked away, is that correct? . . . Q: You didn't consider it completely searched, but Lola did, right? She walked away from the vehicle, correct?"). The Court rejects these arguments. Officer Fisher did not testify that Lola has the authority or capability to decide when a search is complete, and Defendant has not provided the Court with any legal authority that such distinctions exist.

But importantly, even if Officer Fisher commanded Lola to sniff around the vehicle again, or even directed her back to the vehicle for a second time, it is worth repeating that a K-9 sniff outside a vehicle does not constitute a search for Fourth Amendment purposes. *See infra* III.b. Moreover, the officer may direct the K-9 to sniff certain areas of interest. *See United States v. Iverson*, 897 F.3d 450, 461 (2d Cir. 2018) (discussing *United States v. Place*, 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)) (it is lawful for an officer to command a narcotics K-9 to sniff a piece of luggage at an airport). Thus, it is of no legal consequence whether Officer Fisher commanded Lola back to the vehicle for a second time—he is permitted to do so.

*d. Lola's second pass around the vehicle*

"An interior sniff is different." *United States v. Trapp*, No. 13-CR-62, 2014 WL 1117012, at *5 (D. Vt. Mar. 20, 2014). A narcotics-trained K-9's entry *into* a vehicle is a search and implicates the Fourth Amendment *unless* she enters the vehicle on her own volition without the prompting or encouragement from her partner. *See Iverson*, 897 F.3d at 461 (citing *United States v. Sharp,* 689 F.3d 616, 620 (6th Cir. 2012)). Again, the test for determining whether the assistance of a narcotics-trained K-9 provided probable cause to search the vehicle is if all the facts surrounding a reliable K-9's alert, when "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 133 S. Ct. 1050 at 1058.

Officer Fisher testified that he and Lola walked around the vehicle a second time. (Tr. II at 72-73). When Lola came across the open front passenger door of the vehicle she jumped inside and gave a final alert. While the body camera recording of the search did not record Lola's final alert, Officer Fisher testified that Lola independently jumped into the vehicle. (Tr. II at 52). Officer Fisher did not testify that he prompted or encouraged Lola to enter the vehicle.

Officer Fisher testified that he conducts a methodical sniff around the entire vehicle. And, *having just observed that Lola exhibited indications that she smelled narcotics during her first pass*, it made sense for Officer Fisher, based on his training and experience, to go back to the vehicle for a further sniff. *See, e.g.*, (Tr. II at 80) (explaining that the K-9 is to "check all the locations that are productive where odor could be at."); *id.* at 81 ("A: . . . When [Lola] pulled away, I was not satisfied she had finished the vehicle . .

. because she showed me the indications and changes of behavior on the back and on the driver side."); *id.* at 83 ("Q: You would have let her go back to the open door if she had led her way there, correct? A: *When we had gotten around to it*, if she had put her nose into it and jumped in, that's on her.") (emphasis added); s*ee United States v. Gaskin,* 364 F.3d 438, 457 (2d Cir. 2004) ("courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not.").

Based on the foregoing, the Court finds that Officer Fisher permissibly had Lola return to the vehicle to continue her sniff. The Court also finds that Lola entered the vehicle on her own volition and her final alert inside the vehicle established probable cause to search Defendant's vehicle.

III.    Officers Established Probable Cause Independent of the K-9 Assist

The Court finds probable cause to search Defendant's vehicle existed prior to and independent of the K-9 assist, based on the "totality of circumstances" in this case. The Court is required to "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). The following facts, when examined together and based on the "totality of the circumstances", established probable cause to search Defendant's vehicle.

Defendant attempted to purchase tickets in cash to fly to Houston, which, according to law enforcement, is a known source city for drugs. (Dkt. No. 43 at 1-2) (citing to Tr. I). Law enforcement knew co-defendant Lloyd had a prior narcotics conviction and

was traveling outside of the Western District of New York without the permission of his probation officer. *See id.* Co-defendant Lloyd and the two female individuals at the airport were found to collectively be in possession of $64,000 in cash. *Id.* at 2. When questioned at the airport, one of the female individuals was evasive in answering questions about her amount of cash. *Id.* at 3. Co-defendant Lloyd indicated discretely at some point during his airport interview that he wanted to inform the officer "what exactly was going on" concerning this trip to Houston, implying that this group had not been truthful when first questioned at the airport. *See id.* Co-defendant Lloyd also previously disclosed to law enforcement that his cocaine source was in Houston and had previously obtained 30 kilograms of cocaine in Houston. *See* (Dkt. No. 23 at 2-3). After Defendant, Lloyd, and the two female individuals failed to board their plane, Defendant purchased tickets for the following day to fly out of Rochester, New York to Houston.

Defendant's ties to co-defendant Lloyd are not a "brief association with a suspected criminal." *United States v. Speller*, 57 F. Supp. 3d 369, 374 (S.D.N.Y. 2014) (quoting *United States v. Everroad*, 704 F.2d 403, 406 (8th Cir.1983)). The *Speller* court agreed with the Eighth Circuit in that a "brief association with a suspected criminal—when there is no other unlawful or suspicious conduct by any party involved—cannot support a finding of probable cause." *Id.* at 407. Indeed, law enforcement in this case "had much more extensive information indicative of probable cause" to believe that Defendant was engaged in criminal activity, especially after their arrival to Houston. *See id.* at 374.

In Houston, Defendant and co-defendant purchased an inflatable chair from a Walmart for no apparent reason. *See* (Dkt. No. 23 at 3). Defendant and co-defendant later entered a vehicle together and this vehicle engaged in counter-surveillance driving

techniques to evade law enforcement. (Dkt. No. 43 at 4). Co-defendant Lloyd was observed exiting the vehicle with a bag that had the same features as bags known to be used for drugs. *Id.* at 5. The following morning, when Defendant was pulled over, he stated that he was from Georgia and was in Houston to buy property—information law enforcement knew to be false. (Dkt. No. 105 at 11). Defendant and co-defendant were separately questioned about the inflatable chair box in the back seat and both gave conflicting answers regarding what was in the box and its intended use. (Dkt. No. 43 at 6-7).

The Court therefore finds it was reasonable for the officers to believe, based on the observed association of Defendant with co-defendant, based on the events leading up to the traffic stop, the conflicting statements to officers during the stop, and in considering the "totality of the circumstances" presented in this case, that Defendant's vehicle contained contraband and further finds that officers amply established probable cause to search the vehicle prior to and independent of the K-9 assist.

## CONCLUSION

Accordingly, based on the events leading up to the K-9 assisted search of Defendant's rental vehicle and the subsequent narcotics-trained K-9 final alert, Defendant Roman Dunnigan's supplemental motion to suppress all evidence is denied in its entirety.

**IT IS SO ORDERED.**

*s/Richard J. Arcara*

HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated: October 17, 2019