UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

**DECISION AND ORDER**
17-CR-119-A

HENRY LLOYD and
ROMAN DUNNIGAN,

Defendants.

On September 2, 2020, a jury found defendants Henry Lloyd and Roman Dunnigan guilty of participating in a conspiracy to possess with intent to distribute and to distribute 500 grams or more of cocaine in violation of 21 U.S.C. § 846.  The jury also found that their conspiracy involved 500 grams or more of cocaine.

Defendants Lloyd and Dunnigan have moved for judgments of acquittal notwithstanding the jury's verdict pursuant to Federal Rule of Criminal Procedure 29(c) or, alternatively, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  For the reasons stated below, the motions are denied.

## BACKGROUND

The Court assumes the parties' familiarity with the trial and the issues raised by the defendants' motions.  The following is a summary of the evidence introduced during the trial.  Additional evidence is described later.

On May 8, 2017, a Drug Enforcement Administration Special Agent received information that defendants Lloyd and Dunnigan, together with two companions, had made arrangements to travel by commercial airline from Buffalo, New York to Houston, Texas.  The Agent went to the Buffalo airport to investigate, and when he

1

arrived Transportation Security Agency officers were speaking with defendant Lloyd, Breona Gibson, a girlfriend of Lloyd's, and Shianne Gaddis.

Defendant Lloyd denied that he was travelling with "the other couple." Defendant Dunnigan, who was nearby in the airport terminal, saw the others being questioned and left the airport without speaking to any of his travel companions or any law enforcement officers when he saw Gaddis being led away.

In response to questioning by officers, Lloyd said that he was carrying $8,000. In fact, he had $15,000 in cash in his luggage, nearly double the amount he admitted. Gibson had approximately $24,000 in cash that she and Lloyd admitted Lloyd had given to her. Gaddis had $25,000. The women said they were going to Houston to celebrate Gibson's birthday.

The $64,000 was seized by the DEA despite Lloyd's insistence that his cash was all from legitimate sources. Lloyd then pulled the DEA Agent aside and told him that he wanted to meet so that he could tell the Agent what was really going on. They agreed to meet the next morning.

The next day, on Tuesday, May 9, 2017, Lloyd called the Agent and told him that he could not meet that morning but could meet Friday. The two agreed to meet the following Monday, May 15, 2017.

About a half hour later, the Agent learned why Lloyd had postponed their meeting. Lloyd was at the airport in Rochester, New York, scheduled to fly to Houston with defendant Dunnigan, Gibson, and Gaddis. Lloyd had not told the Agent that he was postponing their meeting because he was flying to Houston.

Lloyd was under court supervision at the time and was required to seek permission from the Court and his supervising U.S. Probation officer for any travel. He had not done so.  The Agent notified the DEA's Houston office of Lloyd and Dunnigan's travel arrangements.

On May 9, 2017, Houston police officer Tien Nguyen was informed that Lloyd and Dunnigan and the two women were traveling to Houston from New York.  On May 9 and 10, Officer Nguyen and other law enforcement officers surveilled the group, including at the Crowne Plaza on highway I-10, and in a Walmart where Lloyd and Dunnigan purchased an inflatable chair.  The inflatable chair was in a large box  bearing the brand name "Intex."

On May 10, Officer Nguyen saw Dunnigan get into a BMW at the Crown Plaza and drive down a freeway.  He lost sight of the car after it slowed to 15-30 mph below the speed limit, and he was forced to pass the car to avoid giving away the surveillance.

The BMW returned to the Crowne Plaza about an hour later.  Dunnigan, carrying a backpack, went into the hotel together with someone a member of the surveillance team believed was Lloyd (even though the surveillance team had not seen Lloyd leave the hotel).

The next day, May 11, 2017, at approximately 8:30 a.m., Dunnigan walked out of the Crowne Plaza, put the Intex box in the cargo area of the black SUV he and Lloyd were using, and went back into the hotel.  He and Lloyd came out of the hotel a short time later and left in the SUV.

Officer Francisco Gomez conducted a traffic stop of the defendants' SUV on the 8000 block of Long Point Road next to a United States Postal Office for failing to signal.  A narcotics dog alerted to some marijuana in a center console of the SUV.

Lloyd and Dunnigan were questioned separately.  After looking into the cargo area of the SUV, the officer asked Lloyd about a "sleeping bag" in the back of the vehicle.  Lloyd said it was his and that he bought it so a relative could stay with him in his hotel room.

Lloyd did not correct the officer, but there was no sleeping bag in the vehicle. The Intex box was the only thing in the cargo area in the back of the SUV.  Lloyd told the officer he planned to return the inflatable chair to the store where he had purchased it for a refund.

Lloyd told the officer he was visiting from Buffalo.  He also told the officer that he and Dunnigan were on their way to a Dollar Tree store to buy some white t-shirts.

For his part, Dunnigan told the same officer that he was visiting from Georgia, and that Lloyd had come from Georgia with him.  Dunnigan said they were staying at a Hilton and were not accompanied by any females.  He said the "sleeping bag" or air mattress was Lloyd's, and implied that Lloyd had planned to have a stripper sleep on it.  Dunnigan told the officer they were on their way to an AutoZone to buy some tape.

The Houston police searched the box that was in the cargo area of the SUV and found a brick of cocaine wrapped in the inflatable chair.  Defendants Lloyd and Dunnigan were arrested.  Police also seized five cell phones and $3,800.

4

Subsequent laboratory analysis confirmed that the brick was cocaine and that it weighed approximately one kilogram.

While Dunnigan was in the back of a Houston police car he was recorded on video as he used a wrist phone to tell Gaddis to leave the hotel room and to go to the airport.  He expressed no concern to Gaddis that his friend Lloyd was being arrested unjustly.  He did not ask Gaddis to tell Lloyd's girlfriend, Gibson, that Lloyd was innocent.

On June 6, 2017, law enforcement officers executed a search warrant for Apartment 104, 1807 Elmwood Ave, Buffalo, that was rented in the name "David Thomas."  Among other items, officers recovered two boxes for Intex inflatable furniture similar to the one seized in Houston, a bag of suspected heroin, a bag of suspected cocaine, $5,578 in cash, digital scales with drug residue, a box of baking soda, clear sandwich bags, two black LG flip phones, a measuring cup with residue, and a loaded 9mm handgun.

Officers also seized a Macy's department store receipt with Dunnigan's name on it at that location.  Subsequent laboratory testing confirmed that the substances seized included 343.4 grams of butyryl fentanyl, and 177.1 grams of cocaine.  DNA on the firearm was consistent with Dunnigan's.  Dunnigan eventually admitted that he rented a different apartment in the same building.

The two black LG black flip phones recovered from the Elmwood Avenue apartment appeared identical to an LG flip phone Dunnigan had with him when he was arrested in Houston on May 11, 2017.  One of the two phones was registered to a location in Houston, Texas in March 2017, and contained incoming text messages

to "Bones," a nickname for Dunnigan.  The other was registered to an address in Cheektowaga, New York in August 2016; that phone contained text messages and call logs with the name "Boonie," a nickname for Lloyd.

Dunnigan testified during the trial.  Among other things, he testified he had gone Houston to purchase cocaine to sell to "sniffers or coke heads" before returning to Buffalo.  He testified that the cocaine seized in Houston was his, and he intended to distribute it; he insisted that his close friend Lloyd was unaware of the cocaine and did not conspire with him to possess with intent to distribute or to distribute the kilogram of cocaine seized from their vehicle in Houston.

Despite Dunnigan's trial testimony, both Lloyd and Dunnigan were found guilty by the jury of conspiracy in violation of 21 U.S.C. § 876.  The jury made the additional finding that the cocaine involved was 500 grams or more.

## DISCUSSION

Defendants Lloyd and Dunnigan insist that the United States failed to prove the existence of the conspiracy by legally sufficient evidence and that the guilty verdicts were otherwise manifestly unjust.  The Court concludes otherwise.

**The Rule 29 Standard.**  Rule 29 of the Federal Rules of Criminal Procedure requires a court to set aside a jury's verdict, and to acquit a defendant despite a verdict of guilty, on any charge for which the evidence is insufficient to sustain the conviction.  Fed. R. Crim. P. 29.  A defendant challenging the legal sufficiency of evidence supporting a guilty verdict "bears a heavy burden."  *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quotation omitted); *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003).

The Second Circuit "emphasize[s] that courts must be careful to avoid usurping the role of the jury." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)).  The United States must receive the benefit of  "all inferences . . . [on] issues of credibility in favor of the [jury's] verdict." *United States v. Howard*,214 F.3d 361, 363 (2d Cir. 2000) (ellipsis added).  "Exclusive responsibility" for assessing witness credibility lies with the jury. *United States v. Strauss*, 999 F2d 692, 696 (2d Cir. 1993).

Indeed, before setting aside a jury's verdict, a court must view all forms of evidence in the light most favorable to the United States, and the United States is credited with every reasonable inference that could have been drawn in its favor. *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).  A "court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find the evidence in its totality, not in isolation, sufficient to support guilt beyond a reasonable doubt." *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (quotation omitted); *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989).

A Rule 29 motion can be granted only when evidence that the defendant committed the crime alleged "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quotations omitted).  In even a very close case, if "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *United States v. Applins*, 637 F.3d 59, 76 (2d Cir. 2011) (quotation omitted).

Furthermore, a Rule 29 motion for a judgment of acquittal "does not provide the trial court with an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Facen*, 812 F.3d at 286 (quotation omitted).  A court must sustain a jury's verdict if  "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).   And "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter."  *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

**Sufficiency of the Conspiracy Evidence.**  It is well-settled that to sustain a conspiracy conviction, "there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."  *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984)).  A defendant's simple association with others engaged in criminal activity, mere presence at the scene of a crime, or general knowledge of criminal activity, are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy.  *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008).

In this case, the defendants' primary argument is that there was insufficient evidence of Lloyd's conspiratorial agreement with Dunnigan.  They argue that the jury's verdicts were irrationally based upon Lloyd's mere association with Dunnigan and perhaps Lloyd's general sense that some criminal activity may have been

occurring.  However, the defendants underestimate the cumulative weight of the of the evidence that supports the guilty verdicts.

As summarized above, Lloyd stated he was carrying $8,000 cash when questioned at the Buffalo airport when it was actually $15,000.  Video of his response to further questioning about the suspiciously large amount of cash he and his travelling companions were carrying showed that he was frustrated that his description of legitimate sources of his cash failed to persuade the DEA not to seize the money.

Lloyd had already denied travelling with "the other couple."  Dunnigan was in the vicinity of this encounter and saw some of it.  Instead of seeking to help his friend Lloyd and his other travelling companions, he avoided the encounter by leaving the airport alone.

When law enforcement made it clear to Lloyd the $64,000 was being seized, Lloyd pulled the DEA Agent aside and said that he wanted to meet so that he could tell the Agent what was really going on.  A rational inference from Lloyd's offer to explain the $64,000 might be that there was more that Lloyd was unable -- or unwilling -- to tell the Agent at the airport, even though Lloyd was frustrated that he and his companions were leaving without the cash they arrived with.

But the next morning, Lloyd postponed the meeting.  He called the Agent from the Rochester airport while waiting to board a flight to Houston.  Lloyd rescheduled the meeting for the following week without revealing that he and his companions were again on their way to Houston, despite having lost custody of the $64,000 cash they had purportedly been taking to spend there just the day before.

9

This sequence of events is merely suspicious if viewed in isolation.  And while Lloyd's "mere presence" in the SUV with the kilogram of cocaine, or mere "association with conspirators" certainly would not establish "intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy," *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001), overruled on other grounds by *United States v. Huezo*, 546 F.3d 174, 180 n. 2 (2d Cir. 2008), more was proven during the trial.  When viewed with the other evidence as a whole, as the Court is required to do, this merely suspicious sequence of events leads to rational inferences from Lloyd's actions that tend to show he was knowingly acting in concert with Dunnigan to achieve the aims of the cocaine conspiracy.

For example, Lloyd told a Houston police officer the next day, before the kilogram of cocaine was seized, that he had bought the item in the Intex box that was in the cargo area of the SUV.  Dunnigan had already told the same officer that the item was Lloyd's.  Lloyd acquiesced in the officer's reference to the inflatable chair as a sleeping bag.  The officer told Lloyd that Dunnigan said they were going to return it, and Lloyd agreed.

The Intex box seized in Houston in May was the same brand as the two empty boxes seized in June from apartment 104 at 1807 Elmwood Avenue in Buffalo.  Dunnigan's department store receipt, a black LG flip phone with Dunnigan's nickname, "Bones," that was just like one of the phones seized from Dunnigan in Houston, and another with Lloyd's nickname "Boonie," were found in the apartment. that the other had incoming text messages to "Bones", which was Dunnigan's nickname.  The apartment also contained 177.1 grams of cocaine, 343.4 grams of

butyryl fentanyl, a loaded 9mm handgun with DNA consistent with Dunnigan's on it, $5,578 in cash, and drug paraphernalia.  During his trial testimony, Dunnigan denied that the apartment was his.

Lloyd and Dunnigan were together when they went to a Walmart store and bought the Intex inflatable chair.  They bought nothing else.  The visited another Walmart and a Target store but bought nothing.  Although the Intex box indicated an air pump was not included to inflate the chair, they did not buy one.

When asked by Houston police what the item in Lloyd's Intex box was for, Lloyd and Dunnigan gave different answers.  In light of the evidence as a whole, it was rational for the jury to conclude that the kilogram of cocaine wrapped in Lloyd's inflatable chair did not get there by mere happenstance and without Lloyd's knowledge and agreement.

With this trial evidence in mind, Lloyd's earlier request to the DEA Agent from the Rochester airport to reschedule the meeting about "*what was really going on*" with the $64,000 of cash can be rationally interpreted as a ruse devised by Lloyd to throw off the suspicious DEA Agent so that Lloyd and Dunnigan could make their way to Houston without the DEA being aware of it.

Of course, Lloyd's earlier statement at the Buffalo airport on May 8th about the amount of cash that he was actually carrying can also be rationally interpreted as an attempt to deflect suspicion and to further the conspiracy.  The United States presented evidence that Lloyd had unexplained wealth.

Likewise, Lloyd's denial that same day that he was traveling with Dunnigan and Gaddis can be rationally interpreted as an intentional attempt to distance

himself from his co-conspirator and further deflect suspicion.  Given the evidence, the jury could rationally infer that the $15,000 Lloyd possessed, and the approximately $24,000 he had given Gibson to take to Houston, on top of the $25,000 Gaddis was carrying, was split among the three of them to diminish suspicion and the risk the cash would be seized.  Because both defendants told the Houston police officer that the Intex inflatable chair was Lloyd's just before it was found wrapped around a kilogram of cocaine, it was rational for the jury to conclude that some or all of the $64,000 seized at the Buffalo airport on May 8th had been intended to buy cocaine for resale.

Lloyd and Dunnigan argue that there was no direct evidence of the conspiracy.  Lloyd further argues that the evidence showed, at most, that Lloyd may have realized that Dunnigan possessed some sort of contraband during the traffic stop of their rental SUV in Houston, but that it did not establish Lloyd's specific intent to accomplish the objectives of the conspiracy.

The United States' burden of proof beyond a reasonable doubt did not require the United States to prove the defendants' intentional participation in the conspiracy by direct evidence.  *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014).  Circumstantial evidence is sufficient.  *Id*.  And when the United States introduces circumstantial evidence it "need not 'exclude every reasonable hypothesis other than that of guilt.'"  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)).  The trial included direct evidence that Lloyd possessed items of real significance to the conspiracy, including the Intex inflatable chair in which the kilogram of cocaine was wrapped, and that he

made misleading statements to law enforcement in Buffalo and in Houston which deflected suspicion to further the cocaine conspiracy.  Moreover, there was direct evidence that Lloyd was present at  "critical stages of the conspiracy that cannot be explained by happenstance."  *Anderson*, 747 F.3d at 60 (quotation omitted).

In assessing the evidence to resolve the defendants' Rule 29 motion, the Court must evaluate "the totality of the government's case, . . . as each fact may gain color from others."  *Guadagna*, 183 F.3d at 130 (citing *United States v. Monica*, 295 F.2d 400, 401 (2d Cir. 1961) (Friendly, J.)).  Here, common sense and experience support rational inferences that --- especially after the defendants' costly encounter with the DEA at the Buffalo airport --- Dunnigan would not have exposed his friend Lloyd to the risk of arrest and prosecution for a kilogram of cocaine by secretly buying it, secretly wrapping it in Lloyd's inflatable chair, hiding it in the taped-up Intex box, all while intending to re-open the box and to sell the whole kilogram of cocaine without Lloyd's help to "sniffers or coke heads" in just a couple of hours on the weekday morning before their return flight to Buffalo.  There was a rational basis for the jury to conclude, beyond a reasonable doubt, that the kilogram of cocaine was headed back to Buffalo, wrapped in Lloyd's inflatable chair, to be distributed, and that Lloyd was conspiring with Dunnigan to make it happen.

The Court is mindful that, "[i] n cases of conspiracy, deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (ellipsis in original)).  That deference is

warranted in this case, and the Court concludes that the evidence at trial was legally sufficient to support the jury's verdict that Lloyd and Dunnigan conspired to possess with intent to distribute and to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 846 and 841.

The Court has considered all of the defendants' arguments for a judgment of acquittal and finds them to be without merit.  The defendants' Rule 29 motions are therefore denied.

**The Rule 33 Standard.**  Rule 33 provides that a court may grant a defendant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a); *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013).  A defendant's Rule 33 burden to show that a new trial is warranted is also a heavy burden.  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  A court may exercise its authority under Rule 33 only " 'sparingly and in the most extraordinary circumstances.' " *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992) (quotation omitted). "To grant [a] motion [for a new trial], '[t]here must be a real concern that an innocent person may have been convicted.' " *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quotations omitted).

On the one hand, Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *Sanchez*, 969 F.2d at 1413.  A trial court is permitted to weigh the evidence and credibility of witnesses.  *Id*.  On the other hand, however, "motions for a new trial are disfavored in this Circuit; the standard for granting such a motion is strict . . . ." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) (ellipsis added).  While a

court has "broader discretion to grant a new trial under Rule 33 than to grant a

motion for acquittal under Rule 29," *United States v. Ferguson*, 246 F.3d 129, 134

(2d Cir. 2001), the "court must strike a balance between weighing the evidence and

credibility of witnesses and not 'wholly usurp[ing]' the role of the jury."  *United States*

*v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000). "It is only where exceptional

circumstances can be demonstrated that the trial judge may intrude upon the jury

function of credibility assessment" under Rule 33.  *Sanchez*, 969 F.2d at 1414.  A

court's rejection of trial testimony does not automatically permit a new trial; the court

"must examine the entire case, take into account all facts and circumstances, and

make an objective evaluation."  *Ferguson*, 246 F.3d at 134.  "The ultimate test is

whether letting a guilty verdict stand would be a manifest injustice."  *United States v.*

*Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (quotation omitted).

Defendant Dunnigan argues that the COVID-19 pandemic deprived him of a

fair trial.  He suggests that the jury was so distracted and stressed that they

convicted him just to get the trial over with.

The defendant did not raise this Sixth Amendment fair-trial argument during

the trial, and he points to nothing to support his speculation that the jury acted in

derogation their solemn oath or the Court's instructions.  He cites no authority to

support his position that the COVID-19 pandemic tainted the trial or that the jury

based its verdicts on anything other than the evidence presented during the trial.  He

ignores that the Court repeatedly instructed the jury not to consider anything other

than the evidence presented during the trial.

The Court followed health and safety protocols set forth in a Western District of New York General Order[1] regarding the COVID-19 pandemic, as well as recommendations by a COVID-19 Judicial Task Force[2] during the trial.  The defendant did not object to these protocols or to any distraction caused by the protocols during the trial.  Based upon the Court's observations, the jury was generally attentive during the trial.  The COVID-19 safety precautions that were followed during the trial were cumbersome, but they did not compromise the fairness of the trial or the jury's deliberations and verdicts.  Defendant Dunnigan's argument that he deprived of a fair trial by the effects of the COVID-19 pandemic is without merit.

Both defendants Lloyd and Dunnigan argue that an off-hours episode during the trial when a juror leaving the courthouse saw defendant Lloyd speaking to an excused juror on the steps outside the courthouse rendered the juror biased.  (The juror who witnessed the interaction between Lloyd and the excused juror brought it to the attention of Court staff before the next trial day, when summations were scheduled.)

Investigating potential juror bias during a trial is a "delicate and complex task." *United States v. Thomas,* 116 F.3d 606, 618 (2d Cir. 1997).  Inquiring about potential bias may do more harm than good "by exaggerating the importance and impact of what may have been an insignificant incident."  *United States v. Abrams,*

---

1   https://www.nywd.uscourts.gov/sites/nywd/files/COVID-19%20General%20Order%20-%20Extension %20to%20December%2024%2C%202020.pdf

2   https://www.uscourts.gov/sites/default/files/combined_jury_trial_post_covid_doc_6.10.20.pdf

137 F.3d 704, 708 (2d Cir. 1998).  And when it appears no "reasonable grounds" support speculation of juror prejudice, the Court should make no inquiry.  *See United States v. Rosario*, 111 F.3d 293, 299 (2d Cir. 1997).  In this case, the defendants did not request further inquiry of any potential juror bias during the trial, and they give no reason now to suggest that it was error on their part, or on the part of the Court, to have made no further inquiry.

Dunnigan argues that prosecutors engaged in misconduct during his trial that rendered the trial unfair.  He faces a "heavy burden" in seeking a new trial based upon prosecutorial misconduct.  *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993).  He must address "(1) the severity of the alleged misconduct; (2) the curative measures taken; (3) the likelihood of conviction absent any misconduct."  *Id.* at 945-46.  To prevail, he must show the misconduct to be "so severe and significant as to result in denial of his right to a fair trial."  *United States v. Coplan*, 703 F. 3d 46, 86 (2d Cir. 2012).

Dunnigan argues that it was improper for a prosecutor to seek to impeach his trial testimony denying prior involvement in drug-trafficking by asking if he knew an individual named Tyrone Pennick.  When Dunnigan responded that Tyrone Pennick is his cousin, the prosecutor asked, the defendant,  "And you are a part of his organization to traffic major amounts of narcotics?"  The Court sustained an objection and the defendant denied, in response to two follow-up questions by the prosecutor, trafficking drugs with Pennick or his organization.  The Court sustained another objection when the defendant was asked if Lloyd was a "member" of that drug trafficking organization.

The United States explains that it had a good faith basis for its attempt to impeach the defendant's denial that he had previously engaged in drug trafficking. While the Court finds the attempted impeachment was not masterful, it was not memorable, either.  The use of the phrase "drug-trafficking organization" was potentially inflammatory in the context, but it was not without basis, and the Court sustained counsel's objections.  In the context of the proof as a whole, the Court finds find this exchange did not increase the likelihood of conviction any more than negligibly.

Defendant Dunnigan also complains that the prosecutor stated during his closing argument that Dunnigan supplied to Shianne Gaddis the $25,000 that the DEA seized from Gaddis at the Buffalo airport on May 8, 2017, even though there was no evidence admitted during the trial to support that assertion.  While a prosecutor is certainly "free to make [factual] arguments which may be reasonably inferred from the evidence presented,"  *United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir. 1990), a prosecutor may not "convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant."  *United States v. Young*, 470 U.S. 1, 18 (1985).

Dunnigan testified that he has known Shianne Gaddis as a family friend since she was a child of ten.  And although he was travelling to Houston with her and stayed in the same hotel room with her, he did not help her when she was being questioned by law enforcement at the airport, and he left the airport when he saw her being led away in the airport terminal.  As the Court noted earlier, in light of the evidence as whole, it was rational for the jury to conclude that some or all of the

$64,000 seized at the Buffalo airport on May 8th had been intended to buy cocaine for resale. At worst, it was speculative for the prosecutor to argue Gaddis had been given the $25,000 to carry to Houston by Dunnigan just as her friend Breona Gibson was carrying the approximately $24,000 Lloyd had given her. The prosecutor would have been well-advised to have told the jury that he was suggesting a possible inference from the evidence, *see e.g.*, *United States v. Smith*, 987 F.2d 888, 897 (2d Cir. 1993), but the Court does not find that it was prosecutorial misconduct to argue the inference that Dunnigan had supplied the $25,000 seized from Gaddis.

Dunnigan argues that the United States committed misconduct by offering hearsay evidence when it published to the jury a jail-call recording of Dunnigan that tended to show his nickname is "Bones." However, Dunnigan's out-of-court statement offered against him was not hearsay. Fed. R. Evid. 801(d)(2)(A) and (B); *United States v. Marin*, 669 F.2d 73, 84 (2d. Cir. 1982). It was not prosecutorial misconduct to introduce the jail-call recording.

Dunnigan complains that his trial counsel's performance was so poor that it violated his violated his Sixth Amendment right to the effective assistance of counsel. Under the familiar test of *Strickland v. Washington*, 466 U.S. 668 (1984), the defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that the poor performance prejudiced the outcome of the proceeding. *See Strickland*, 466 U.S. at 687–88.

It is well-settled that, "[j]udicial scrutiny of counsel's performance must be highly deferential," and the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at

689.  This means that Dunnigan's burden to show that his trial counsel's performance was deficient is a "heavy one."  *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012).

Dunnigan argues that his trial counsel's failure to object during the beginning of the prosecutor's closing arguments to repeated references to "lies" of Dunnigan's was ineffective.  Given that the defendant admitted during cross-examination that a number of specific statements that he had previously made had been lies, the argument was not inherently improper, *see e.g.*, *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987), and the potential issue was addressed by the Court during an interruption of the prosecutor's argument due to a technical problem in the Court's sound system.  The Court does not find Dunnigan was unfairly prejudiced by the portion of the argument of which he complains.

As for the Dunnigan's related complaint that there was no tactical justification for trial counsel not to object to the prosecutor's remarks, the Court disagrees. Dunnigan had admitted a number of false statements he had made were lies.  Some of his testimony during the trial was palpably incredible.  The prosecutor's closing had just begun.  A reasonable defense lawyer might well have been concerned that objecting at the point would do more harm than good by undermining the counsel's own credibility with the jury or by implicitly conceding more significance to the admitted lies than was deserved.  Trial counsel might well have concluded it was better to wait and to respond to the prosecutors remarks in his closing argument. *See e.g., United States v. Daniels*, 558 F.2d 122, 127 (2d Cir. 1977).  Trial counsel's

failure to object during the prosecutor's summation was not ineffective assistance of counsel.

Dunnigan's remaining claims of ineffectiveness are no more substantial. Together these claims even cumulatively fail to come close to meeting his burden to show that his trial counsel performed below the objective standard of reasonableness and prejudiced Dunnigan.

Dunnigan sought various forms of supplemental relief in a handwritten attachment to a legal memorandum of counsel by arguing that the evidence presented to the Grand Jury was legally insufficient, that the Grand Jury lacked jurisdiction, and other arguments. The Court has considered these arguments and concludes that they lack any merit and need no discussion.

Finally, for each defendant, the Court has given due consideration to the collective weight of the evidence, each defendant's arguments of the collective weight of exculpatory inferences based upon the credible evidence, and each defendant's arguments for a new trial. The Court finds the jury's verdicts were not manifestly unjust. The defendants' motions for a new trial pursuant to Rule 33 are therefore denied.

**CONCLUSION**

For the foregoing reasons, the motions pursuant to Federal Rule of Criminal Procedure 29(c) of defendants Henry Lloyd and Roman Dunnigan for judgments of acquittal notwithstanding the jury's verdicts or, alternatively, pursuant to Federal Rule of Criminal Procedure 33 for a new trial, are denied.

The parties are directed to appear for a status conference to set a sentencing date on Tuesday September 7, 2021 at 9:30 a.m.

**SO ORDERED.**

_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  September 1, 2021