UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

UNITED STATES OF AMERICA,

    v.

ROMAN DUNNIGAN,

              Defendant.

**DECISION AND ORDER**
17-CR-119-A

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Defendant Roman Dunnigan is awaiting sentencing after he and his co-defendant Henry Lloyd were convicted by a jury of participating in a conspiracy to possess with intent to distribute and to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841.  Pending before the Court are Dunnigan's objections to the U.S. Probation Office's recommendations affecting Dunnigan's total offense level under the United States Sentencing Guidelines (U.S.S.G.).

Specifically, Dunnigan has objected (Dkt. No. 277) to the recommendation that the Court calculate a base offense level of 30 from the amount of converted drugs, as well as the recommendation that the Court impose a two-level firearms enhancement, a two-level drug-involved premises enhancement, and a two-level obstruction of justice enhancement.  The Government filed opposition papers (Dkt. No. 278) to the objections.  Oral argument was heard, and the Court thereafter ordered (Dkt. No. 312) supplemental briefing from the parties, the latter which has since been docketed (Dkt. Nos. 314, 315).

The Court assumes the parties' familiarity with the prior proceedings in this case, the evidence presented at trial, and the objections that have been raised. The Court specifically incorporates by reference its prior Decision and Order (Dkt. No. 267) denying defendants' post-trial motions, and Probation's Addendum to its presentence investigation report (Dkt. No. 334, pp. 25-28). After due consideration, the Court finds that the base offense level is properly calculated at 30, and that each of the three contested enhancements apply, for a total offense level 36 as recommended by Probation.

## DISCUSSION

### I.     Drug-Quantity Relevant Conduct

Dunnigan argues that his base offense level is appropriately calculated at 24, which accounts for the approximately one kilogram of cocaine seized by law enforcement from his and Lloyd's vehicle in Houston, Texas, as opposed to base offense level 30 as calculated by Probation.[1]  Like Probation, the Government maintains that 30 is Dunnigan's base offense level.

"A Sentencing Guidelines calculation must begin with an identification of the defendant's relevant conduct, which in the case of a drug . . . offense includes the quantity of drugs controlled by the defendant[.]"  *United States v. Jones*, 531 F.3d 163, 174-75 (2d Cir. 2008).  "The quantity of drugs attributable to a defendant is a question of fact" to be resolved by the sentencing court by a preponderance of the evidence standard from direct or circumstantial evidence.  *Id.* at 175; *see* § 6A1.3.

---

[1] To avoid any *ex post facto* issues, Probation used the 2016 Guidelines Manual in its offense level computations.

The Guidelines explain that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."  U.S.S.G. § 2D1.1 app. n.5.  "To sustain quantity-based enhancements for relevant conduct, the court must base its findings on specific evidence - which can be circumstantial - such as drug records, admissions or live testimony."  *United States v. Muhammad*, 520 Fed. Appx. 31, 34 (2d Cir. 2013) (summary order) (quotation marks omitted), quoting *United States v. Archer*, 671 F.3d 149, 162 (2d Cir. 2011).

Preliminarily, Probation did not include as relevant conduct its conversion of $64,000 in cash found in the possession of Lloyd and the defendants' two traveling companions at the Buffalo Niagara International Airport on May 8, 2017.  Probation reasons the cash was seized and therefore could not have been used to purchase cocaine.  Thus, any objection regarding the counting of the $64,000 as relevant conduct, or if not the entirety of the $64,000 the appropriate portion to deduct as "reasonable travel expenses," is moot.

The parties dispute, however, whether items seized during the execution of a search warrant on June 6, 2017 at 1807 Elmwood Avenue, Apartment 104, Buffalo, New York, should be counted as relevant conduct.  Dunnigan argues that there was no evidence at trial establishing a connection between him and Apartment 104 or the items found therein.  The Court finds circumstantial evidence proves otherwise.

At that location, law enforcement recovered, among other items, two empty boxes for Intex inflatable furniture akin to the Intex box seized in Houston, a bag of suspected heroin, a bag of suspected cocaine, $5,578 in cash, digital scales with

drug residue, a box of baking soda, clear sandwich bags, two black LG flip phones, a measuring cup with residue, and a loaded 9mm handgun.  Subsequent laboratory testing confirmed that the substances seized included 343.4 grams of butyryl fentanyl and 177.1 grams of cocaine, and DNA analysis could not exclude Dunnigan's DNA as a contributor to the DNA profile on the firearm.  Officers also seized a Macy's department store receipt with Dunnigan's name on it.  The two black LG black flip phones appeared identical to an LG flip phone Dunnigan had with him when he was arrested in Houston on May 11, 2017.  One of the two phones was registered to a location in Houston, Texas in March 2017, and contained incoming text messages to "Bones," a nickname for Dunnigan.  The other phone was registered to an address in Cheektowaga, New York in August 2016, and contained text messages and call logs with the name "Boonie," a nickname for Lloyd.

Detective Adam Imiolo, who helped execute the search warrant, testified that he believed both Intex boxes recovered from Apartment 104 were empty.  He also testified that "the apartment almost looked vacant.  It didn't looked lived in . . . It didn't appear [that anyone was living there].  I believe there was very little furniture. I don't believe any clothes.  Almost like it was open or vacant."[2]

Dunnigan testified that he rented a different apartment in the same building, Apartment 119, although he denied that Apartment 104 was his.

The Court concludes that it is more likely than not, when viewing the foregoing evidence in its totality, that Apartment 104 was utilized by Dunnigan as a

---

[2] T. 176, 179-180.  Hereinafter, "T. __" refers to pages of the combined trial transcript located at Docket Numbers 215-219, 225-226, 229-230, and 257-258.

4

"stash" location for his drug trafficking activity while he rented a different apartment in the same building in which to reside.  As such, the $5,578 in cash, 343.4 grams of butyryl fentanyl, and 177.1 grams of cocaine are to be converted to marijuana equivalency and included as relevant conduct in calculating the base offense level.

Dunnigan reasons that if Lloyd may not be held accountable for the items in Apartment 104, including the cocaine—as recommended in Lloyd's revised report—neither should he, because to do otherwise undermines the cocaine conspiracy with Lloyd.  He muses that he could have been on a "solo venture" that was divorced from any conspiracy with Lloyd.  This position misinterprets the law regarding relevant conduct, however.

"Relevant conduct" includes "acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).  The Guidelines further explain, "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  U.S.S.G. § 1B1.3, app. n.5(B)(ii).

The Second Circuit has further elaborated that unlike "common scheme or plan," the term "same course of conduct" does not "require a connection between the acts."  *United States v. Burnett*, 968 F.2d 278, 280 (2d Cir. 1992).  Rather, "[t]he 'same course of conduct' concept . . . looks to whether the defendant repeats the same type of criminal activity over time.  It does not require that acts be 'connected together' by common participants or by an overall scheme.  It focuses instead on

5

whether defendant has engaged in an identifiable 'behavior pattern' of specified criminal activity."  *Id.*, quoting *United States v. Perdomo*, 927 F.2d 111, 115 (2d Cir. 1991) (citations omitted), *superseded on other grounds*.

Lloyd's lack of knowledge regarding Apartment 104 is thus not dispositive of Dunnigan's continuing course of conduct.  Instead, the evidence presented at trial supports a finding that Dunnigan "engaged in an identifiable behavior pattern of narcotics activity."  *Burnett*, 968 F.2d at 280.

The Court finds that the evidence detected on May 11, 2017 and June 6, 2017 was strikingly alike.  Indeed, the circumstantial evidence is strong, making it very unlikely that the items in the Elmwood apartment were there by mere coincidence.  To reiterate, a one-kilogram brick of cocaine was seized from Dunnigan's and Lloyd's vehicle on May 11, 2017, while 177.1 grams of cocaine was recovered from the Elmwood apartment on June 16, 2017.  On May 11, 2017, the kilogram of cocaine was hidden in an Intex box, while on June 16, 2017, two empty Intex boxes were found in the empty Elmwood apartment along with drug paraphernalia and a loaded and operable firearm.  Moreover, on May 11, 2017, law enforcement seized thousands of dollars of U.S. currency from Lloyd's person at the time the cocaine was discovered (after $64,000 in cash had been seized at the Buffalo airport from Dunnigan's traveling companions on May 8, 2017), and on June 6, 2017, thousands of dollars of U.S. currency was recovered from the Elmwood apartment.  The Court therefore concludes that Dunnigan's drug trafficking activities were sufficiently similar to constitute a pattern of behavior for the June 6, 2017

activities to constitute relevant conduct.  The two dates were also temporally proximate to each other (a difference of only 26 days).

The butyryl fentanyl is attributable to Dunnigan as relevant conduct even though the May 11, 2017 offense did not involve fentanyl.  "Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level."  U.S.S.G. § 1D1.1, app. n.5, citing § 1B1.3(a)(2); *see also Perdomo*, 927 F.2d at 114 ("[W]e have repeatedly held that quantities and types of narcotics uncharged in the offense of conviction can be included in a defendant's base offense calculation if they were part of the 'same course of conduct' or part of a 'common scheme or plan' as that offense[.]") (collecting cases); *see generally United States v. Erskine*, 280 Fed. Appx. 16, 19 (2d Cir. 2008) (summary order) (" '[T]he relevant conduct provision of [the Sentencing Guidelines] is to be interpreted broadly to include . . . conduct not charged in the indictment.' "), quoting *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994).

As for the two empty Intex boxes, Probation recommends approximating one kilogram of cocaine as having been shipped from Houston to Buffalo to include as relevant conduct.  Dunnigan argues that even if the U.S. currency and cocaine seized from the apartment are attributed to him, it would be erroneous to assume or speculate that each of the two Intex inflatable furniture boxes recovered from the apartment had shipped one kilogram of cocaine, or that even one of the boxes had shipped one kilogram of cocaine.  Dunnigan reasons it is illogical to assume individuals ship the same amount or same kind of drug every time they package and

ship drugs.  The Court finds that it need not resolve this objection, as it will not impact the base offense level.

The Court rejects Dunnigan's assertion that his base offense level should be 24 as his relevant conduct is at least 500 grams but less than 2 kilograms of cocaine.  In sum, Dunnigan is accountable for the 1,000.41 grams of cocaine seized from him and Lloyd on May 11, 2017; the equivalent of 0.16 grams of cocaine, converting the $3,842 of U.S. currency seized from Lloyd on May 11, 2017 at the time the one-kilogram brick of cocaine was seized; the equivalent of 55.78 grams of cocaine, converting the $5,578 seized from the Elmwood apartment; 177.1 grams of cocaine seized from the Elmwood apartment; and 343.4 grams of butyryl fentanyl seized from the Elmwood apartment.  For Guidelines purposes, these substances are, in total, the equivalent of approximately 1,105.19 kilograms of marijuana. Because this total is greater than 1,000 kilograms of marijuana but less than 3,000 kilograms of marijuana, Dunnigan's base offense level pursuant to Guidelines §§ 2D1.1(a)(5) and (c)(5) is 30.

## II.  Drug-Involved Premises Enhancement

"In order to apply § 2D1.1(b)(12), a court must conclude that the defendant (1) 'maintained a premises' (2) 'for the purpose of manufacturing and distributing a controlled substance.'"  *United States v. McDowell*, 804 Fed. Appx. 38, 40 (2d Cir. 2020) (summary order), quoting U.S.S.G. § 2D1.1(b)(12).  Dunnigan objects to this two-level enhancement with respect to Apartment 104.

It is undisputed that the manufacturing or distribution of controlled substances was either the "sole purpose" or one of the "primary or principle uses for the

8

premises," as opposed to an "incidental or collateral" use.  U.S.S.G. § 2D1.1, app. n.

17.  Again, the Elmwood apartment was practically vacant and showed no signs of

someone living there.  Instead of housing residents, the apartment housed drug

paraphernalia, thousands of dollars in U.S. currency, 343.4 grams of butyryl

fentanyl, 177.1 grams of cocaine, and a loaded and operable handgun.  The Court

concludes, and Dunnigan does not argue to the contrary, that the apartment served

as a "stash house."[3]

Dunnigan instead argues that the enhancement does not apply because there

was insufficient proof that he "knowingly maintain[ed]" the premises.  U.S.S.G. §

2D1.1, app. n.17 ("Among the factors the court should consider in determining

whether the defendant 'maintained' the premises are (A) whether the defendant held

a possessory interest in (e.g., owned or rented) the premises and (B) the extent to

which defendant controlled access to, or activities at, the premises.").  Dunnigan

argues that there was no proof in the form of keys, or a lease in his name, and none

of the Government's witnesses who searched the apartment had ever seen

Dunnigan there.  Dunnigan further argues that a National Fuel utility bill with the

name of "David Thomas" was discovered in the kitchen of the apartment,[4]

suggesting someone else may have maintained control of the premises, yet no

---

[3] FBI Special Agent Mark Schirching testified about the meaning of the term "stash location,"
which is not typically "a place where someone resides" and instead typically includes packaging
to break down narcotics, scales to weigh the quantities of narcotics, drug proceeds, and
firearms.  He further explained that firearms are "generally a tool of the trade of a narcotics
trafficker."  T. 450-451.

[4] *See* T. 183.

follow-up investigation was done regarding Thomas or to determine whose name was actually on the lease.

While these are certainly factors for the Court to consider, it is the Court's understanding that "neither the fact that [the defendant] did not own or lease the apartment nor the lack of evidence that he had a key are dispositive." *United States v. Carbajal*, 717 Fed. Appx. 234 (4th Cir. 2018). The record reveals that: (1) at least one document with Dunnigan's name on it was in the apartment, *i.e.*, the Macy's receipt; (2) one of the two black LG flip phones contained a text message to "Bones," Dunnigan's nickname; (3) the other LG flip phone had been purchased on March 5, 2017 from 8412 Katy Freeway, Houston, Texas,[5] and the Crowne Plaza, where Dunnigan and his traveling companions stayed in May 2017, was at "the 7600 block" of Katy Freeway, Houston, Texas;[6] (4) Dunnigan acknowledged renting a different apartment in the same building, which was corroborated by another witness;[7] (5) DNA on the firearm was consistent with Dunnigan's; and (6) two Intex boxes were found in the apartment, the same brand of box the defendants hid a one kilogram brick of cocaine in 26 days before.

The Court concludes that the enhancement is properly applied, based on the totality of the circumstances including the items recovered from the apartment. *See United States v. Holley*, 638 Fed. Appx. 93, 98 (2d Cir. 2016) (the evidence

---

[5] *See* Gov't Ex. 24; Dkt. No. 278-4.

[6] T. 82.

[7] *See* T. 541, 569.

established that the defendant "controlled access to [an] apartment based on the presence of his shoes, mail, and keys and the defendant's "unrestricted access to the apartment").

## III.    Obstruction Enhancement

Dunnigan challenges the report's application of a two-level obstruction of justice enhancement under § 3C1.1 for his testimony at trial that Probation and the Government maintain constituted perjury.

"Conduct covered under this section of the Sentencing Guidelines includes perjury."  *United States v. Harris*, 741 Fed. Appx. 823, 826 (2d Cir. 2018) (summary order); *see* § 3C1.1, Commentary, app. n.4(B).  In *United States v. Dunnigan*, 507 U.S. 87 (1993), the Supreme Court held that "if a defendant objects to a sentence enhancement resulting from [his or] her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same, under the perjury definition" from the federal criminal perjury statute, 18 U.S.C. § 1621(1).  *Id.* at 95.  Per that definition, a witness commits perjury if he or she "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  *Id.* at 94. As such, "before applying an obstruction enhancement based on perjury, the sentencing court must find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Thompson*, 808 F.3d 190, 194-195 (2d Cir. 2015) (per curiam) (internal quotation marks and citations

11

omitted); *see United States v. Lewis*, No. 21-838, 2023 U.S. App. LEXIS 6689, *26 (2d Cir. 2023) (citing the "preponderance of the evidence" standard in *Thompson*).

The Second Circuit has explained that "perjury, for purposes of a sentencing enhancement, can be established by circumstantial evidence." *United States v. Onumonu*, 999 F.2d 43, 46 (2d Cir. 1993); *see United States v. Nunez*, No. 3:18cr318 (MPS), 2021 WL 5494588, 2021 U.S. Dist. LEXIS 225641, *4 ("In determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence.") (D. Conn. Nov. 23, 2021) (internal quotation marks and citation omitted).

As an initial matter, Dunnigan asserts that under this Guidelines section the Court is required to construe a defendant's trial testimony "in the light most favorable to the defendant." Dkt. No. 277, p. 4 and Dkt. No. 315, p. 8, citing *Onumonu*, 999 F.2d at 45. However, the language quoted by Dunnigan originates from Application Note 1 to § 3C1.1 in a prior version of the Guidelines that was deleted by the U.S. Sentencing Commission in November of 1997. *See United States v. Greer*, 285 F.3d 158, 182-183 (2d Cir. 2000). The Commission removed the "most favorable" language and instead now advises courts to "be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." *Id.* at 183, citing U.S.S.G. Manual App. C, amend. 566 (effective Nov. 1, 1997); *see* § 3C1.1, app. n.2. The Second Circuit has remanded cases for resentencing where the district court "committed legal error by applying the old

standard," directing the district court to "evaluate the statements under the current standard."  *Greer*, 285 F.3d at 182-183.

With these requirements in mind, the Court applies the enhancement for obstruction of justice in this case.

Dunnigan elected to take the stand and was the sole witness who testified in his defense case.[8]  Dunnigan argues that the enhancement should not apply because he did not deny all wrongdoing.  Rather, he acknowledged he possessed cocaine with the intent to sell it in Houston and otherwise simply "did not entirely agree with the Government's theory" of the case.  He further argues that the testimony listed in the Government's supplemental brief (*see* Dkt. No. 314, pp. 15-18) is either immaterial or unintentional, or cannot be proven false, and therefore none of it meets the requisite definition of perjury.

This Court has reviewed the alleged perjurious statements in the context of Dunnigan's testimony as a whole and the other trial evidence and concludes that while a number of examples provided by the Government are not perjurious themselves because they are immaterial or could be the result of faulty memory,[9] Dunnigan also testified about specific facts critical to the determination of his guilt or innocence.  By way of the latter category of testimony, Dunnigan sought to

---

[8] Dunnigan's testimony can be found at T. 545-637 and T. 656-733 of the record.

[9] For example, Dunnigan testified about the month (either March or April 2017) when he first met his cocaine supplier, Luiz.  *See* T. 556-558, 594.  The timeframe for when he first met his supplier—the difference of a month or two—is not material.  Moreover, the Court concludes from its review of the record that any minor inconsistency in this regard is likely the result of confusion or Dunnigan's faulty memory.  *See* T. 694-695, 701.

undermine the elements of the offense—and that testimony was inconsistent with the jury's guilty verdict as to him and Lloyd.  "To prove a drug trafficking conspiracy, the government must demonstrate (1) the existence of the charged conspiracy and (2) defendant's knowing participation therein."  *United States v. McDade*, 663 Fed. Appx. 34, 36 (2d Cir. 2016) (summary order), citing *United States v. Story*, 891 F.2d 988, 992 (2d Cir. 1989).

As stated by the Court in its prior Decision and Order on post-trial motions, some of Dunnigan's trial testimony was "palpably incredible."

Dunnigan testified that the individuals with whom he traveled to Houston in May 2017, including his longtime, good friend Lloyd, knew nothing about Dunnigan's plan to purchase a brick of cocaine for $25,000 on the trip, which he stated he then intended to sell only to "sniffers"[10] and "coke heads" who he met at "high-end parties" and lounges.  The trip to Houston, testified Dunnigan, was a self-proclaimed solo venture with which he had no assistance—and he had formed no agreement with others concerning the kilogram of cocaine.  Dunnigan also testified that he secreted the brick of cocaine in the Intex inflatable mattress box (which was seized from his and Lloyd's vehicle) without Lloyd's knowledge, a box that he had purchased with Lloyd two days before.  If believed, Dunnigan's testimony would tend to show that the unlawful agreement charged in the indictment, *i.e.*, possession of cocaine with intent to distribute it or distribution of cocaine, did not exist and

---

[10] Dunnigan explained that "sniffers" are college students and working-class individuals who "want to function" and buy the cocaine for that purpose.

Dunnigan did not enter into such an agreement.  The Court finds this testimony unbelievable, and the jury did as well.

Dunnigan's testimony also advanced a buyer-seller defense which, if believed, would have undercut the membership element.  Again, the jury necessarily rejected this testimony in reaching a guilty verdict.  "As set forth by the Second Circuit, the 'buyer-seller' defense essentially immunizes from conspiracy liability buyers and sellers 'in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, [and where] there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy.'"  *Medina v. United States*, 07-CV-1346; [02-CR-291], 2008 WL 5105282, 2008 U.S. Dist. LEXIS 97364, *7 (N.D.N.Y. Dec. 1, 2008), quoting *United States v. Medina*, 944 F.2d 60, 65 (2d Cir. 1991).

While Dunnigan attempted to distance himself from Lloyd, he still faced the hurdle that the jury could conclude he engaged in a conspiracy with his source of supply in Houston, Luiz.  In that vein, he testified that he had no discussions with Luiz about how he intended to sell the cocaine he purchased from him, and that they had no relationship beyond the couple cocaine purchases Dunnigan made from him. Dunnigan also testified that he would take the kilogram-quantity of cocaine and break it down for small street distribution, which would have required a substantial amount of sales in a city he did not reside in (and Dunnigan estimated it would have taken him three months to sell one kilogram of cocaine, yet he only visited Houston for only a week at a time).  Moreover, Dunnigan testified that anyone, even someone who had no contacts, could purchase drugs in Houston—including a brick of

cocaine—by simply walking into any Mexican restaurant or bar.  This far-fetched

testimony, which was explicitly refuted by Detective Hector Gonzales,[11] who had

been working in the narcotics division of the Houston Police Department for over 25

years, is circumstantial evidence that Dunnigan intended to obstruct justice by trying

to convince the jury that he was not involved in any cocaine conspiracy and was

selling cocaine only in personal-use amounts.

The Second Circuit has cautioned that "[t]he obstruction enhancement should

not be applied when a defendant may have reasonably believed that his statement

was true, whether because of a misunderstanding, a lapse in memory, or otherwise

. . . [However], [i]f a defendant testifies to a detailed account that is demonstrably

false, the enhancement has been found to apply."  *United States v. Lewis*, 2023 U.S.

App. LEXIS 6689, *26-27 (2d Cir. 2023).  The Court finds it would be irrational,

considering the jury's verdict and the evidence presented at trial, to determine that

Dunnigan's false testimony relative to the elements of the crime resulted from

confusion, mistake, or false memory.  As such, the Court finds that Dunnigan gave

intentionally false testimony concerning material facts for the specific purpose of

obstructing justice.

## IV.    Firearm Enhancement

Last, Dunnigan objects to the application of a two-level sentencing

enhancement under § 2D1.1(b)(1) for possession of a firearm during the

commission of the drug conspiracy.  He primarily argues that the DNA found on the

---

[11] T. 819.

loaded and operable semi-automatic pistol recovered from Apartment 104 is "not probative" of his possession of the gun.

The application notes to § 2D1.1(b)(1) provide, "The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons.  The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1(b)(1), app. n.11(A).[12]

The Government's DNA expert, forensic biologist Thomas Grill, testified at trial[13] that the DNA sample from the pistol was a mixture of DNA from three individuals, including at least one male.  The laboratory utilized STRmix software to calculate a "likelihood ratio," *i.e.*, a statistic generated by the program to reflect the ratio of two scenarios to discern which is more likely to occur—here, the probability of the DNA profile from the handgun if Dunnigan is a contributor compared to the probability if he is not.

Grill explained that the DNA results were at least 10,500 times more likely if they had originated with Dunnigan and two unknown individuals than if they had originated from three unknown individuals, which provided a "strong statistical probability" for the prosecution's proposition that Dunnigan was a contributor to the DNA profile.  Grill testified, in other terms, that Dunnigan's DNA profile was

---

[12] The application note continues, "For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet."

[13] *See* T. 265-308.

consistent with (meaning he could not be excluded from) the DNA profile on the

pistol.  On cross-examination, Grill explained that as stated in his report, had the

likelihood ratio been 9,999, it would have fallen into the "moderate likelihood" range

supporting the Government's theory, rather than the "strong support" range of

10,000 up to 999,999.[14]

According to Dunnigan, the "fairly low likelihood ratio" calculated by Grill is so

low it "does not satisfy even the relaxed preponderance of the evidence standard."

Dunnigan also reasons that if the likelihood ratio had been higher, the Government

would have indicted him with a firearms-possession charge, and he would have then

been able to defend himself against that charge at trial.[15]

In a felon-in-possession case out of the Sixth Circuit where the defendant

challenged the admissibility and reliability of the same "form of DNA-sorting

evidence" as in the instant case, and the software generated a likelihood ratio linking

the defendant to the gun in question, the Court explained:

> The likelihood ratio tells us only that, *in the abstract and
> without considering any other evidence in this case*, it
> would be unusual if this DNA contained no DNA
> contributed from [the defendant].  *The ratio does not on its
> own tell us how likely it is that [the defendant] illegally
> possessed a firearm.*  Determining whether it is likely that
> [the defendant], as opposed to someone else, contributed

---

[14] Grill also testified on cross-examination that the statistical threshold for concluding DNA belongs to a person of interest—*i.e.*, concluding no one else would have that DNA profile—is 307 billion.

[15] It is of no moment for purposes of sentencing that the U.S. Attorney's Office did not charge Dunnigan with a gun possession offense in the indictment, regardless of the reason.  "There is no requirement that sentencing guidelines adjustments be charged in an indictment."  *Toro v. United States*, 09 Civ. 3121 (DLC), 2010 WL 446473, 2010 U.S. Dist. LEXIS 11242, *10 n.2 (S.D.N.Y. Feb. 8, 2010).

> to the mixture *requires looking at other facts beyond the scope of DNA evidence.*

*United States v. Gissantaner*, 990 F.3d 457, 462 (6th Cir. 2021) (emphases added). In other words, DNA evidence should not be viewed in isolation.  Indeed, courts look to the "totality of the circumstances" to determine whether the firearm enhancement is justified.  *United States v. Garcia*, 57 Fed. Appx. 486, 490 (2d Cir. 2003) (summary order).

The Court finds by the preponderance of the evidence that the trial evidence, including the DNA analyst's testimony in conjunction with the other evidence presented by the Government linking Dunnigan to Apartment 104, supports application of the two-level sentence enhancement for possession of a firearm.

## CONCLUSION

The Court acknowledges the lengthy period it took to render the instant Decision and Order following the filing of Dunnigan's objections and the Government's opposition papers.  These issues required careful consideration, and the Court re-reviewed the trial evidence before arriving at Dunnigan's advisory range.

Dunnigan's objections are resolved in the manner set forth herein, and the Court concludes the total offense level is 36.  With a Criminal History Category IV, Dunnigan's advisory Guidelines range is 262 to 327 months, and he faces a statutory minimum term of incarceration of 5 years and a maximum of 40 years.  As previously directed, the parties shall appear in person for sentencing on April 4, 2023, at 12:30 p.m.

**SO ORDERED.**

*s/Richard J. Arcara*

HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:   April 3, 2023
           Buffalo, New York